No. 18-2319

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

DOMINIC HENLEY,

Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

_____

On Appeal from the U.S. District Court
For the Eastern District of Missouri
No. 4:16-cv-626; 4:11-cr-246-4 (Perry, J.)

_____

_____

**APPLICATION FOR CERTIFICATE OF APPEALABILITY**

_____

Jeremy Gordon, Esq.
1848 Lone Star Road, Suite 106
Mansfield, Texas 76063
Tel: 972-483-4865
Fax: 972-584-9230
Email: Jeremy@gordondefense.com
TX Bar No. 24049810

*Attorney for Dominic Henley*

Appellant Dominic Henley ("Henley"), by and through the undersigned counsel, respectfully submits this Application for Certificate of Appealability, and offers the following in support thereof.

## I. BACKGROUND

Henley was convicted of Racketeering Conspiracy and Conspiracy to Commit Murder in Aid of Racketeering Activity and sentenced to 204 months in prison. Henley was president of the St. Louis chapter of the Wheels of Soul, a motorcycle club with chapters across the nation. *United States v. Henley*, 766 F.3d 893, 898-99 (8th Cir. 2014). Henley's conviction on the conspiracy to commit murder charge stemmed from:

> On January 29, 2011, defendants Fry and Henley, along with other members of the Wheels of Soul, attended a "Black New Years" party in St. Louis. The government introduced evidence at trial of a Wheels of Soul plan to shoot members of the Outcast motorcycle club attending the party . . . . Allan Hunter later testified that the plan was to shoot members of Outcast at the party since there was a "war" between the two clubs . . . .
>
> Ultimately Wheels of Soul members Jamal Brandon, Walter Lee, and defendants Henley and Fry attended the Black New Years party . . . . When the Outcast members left the party that night, Fry sent a text message to Lee which indicated that he needed to get ready to "carry out the mission." Lee stated at trial that while he had not come to the party to participate in a hit, he felt at the time that he had to participate for fear that otherwise he would "get [his] ass stomped" at the next Wheels of Soul meeting. Lee

1

testified that he then went with Fry, Brandon, and Henley to retrieve guns from their truck and that Henley said [g]ive me the gun. I'll do it." When the group heard that Outcast had "disappeared," the plan was abandoned.

*Id.* at 903.

Henley was represented by attorney Donnell Smith throughout the proceedings. Prior to trial, the Government raised concerns over an apparent conflict of interest in Mr. Smith's representation of Henley. On February 29, 2012, the Government filed an *Ex Parte* Motion for Inquiry Into Potential Conflict of Interest. (DCD 571).[1] According to the Government's motion:

> On or about February 29, 2012, the [Government counsel] was notified by Special Federal Officer and case agent Andria Van Mierlo that a reliable confidential informant working with the Federal Bureau of Investigations had revealed that the President of the Outkast Motorcycle Club's St. Louis Chapter is the brother of Donnell Smith, who is presently representing defendant Dominic Henley.

(DCD 571).

A hearing on the alleged conflict was held on March 2, 2012, before U.S. Magistrate Judge Frederick R. Buckles. The court discussed

---

[1] All district court docket entries ("DCD") in this matter are from *United States v. Henley*, No. 4:11-cr-246-CDP-4 (E.D. Mo.), unless otherwise noted.

2

a potential conflict of interest with Mr. Smith continuing as attorney for Henley. Mr. Smith confirmed that his brother was indeed a member of Outcast. After Smith admitted that he was on speaking terms with his brother, Judge Buckles told Smith that "it's imperative that you let Mr. Henley know this." (DCD 1748 at 5).

Judge Buckles ordered that Henley be brought in for the hearing so that Smith could discuss the issue with Henley. *Id.* at 6. Prior to doing so, the court acknowledged:

> [E]ven if Mr. Henley is willing to waive any kind of conflict that there might be, the Court doesn't have to accept that. I mean, it can be of such a serious nature that the Court can decide that, you know, those concerns override any others and that the defendant simply cannot be allowed to waive the conflict in the circumstances.

*Id.* at 8.

The court then took a recess to allow Smith and Henley to confer. Approximately an hour later, the proceedings resumed and Henley was brought into the courtroom. Judge Buckles advised Henley that:

> [Mr. Smith] could be in a situation where he has loyalties, you know, blood loyalties to family members, but then he has loyalties to you. And what if these two loyalties are in conflict? Is that always going to be in the back of his mind or is he going to – you know, how is he going to deal with that? And those are the – those are very serious concerns. So I

3

think you ought to have the chance to talk about this more than just for a half hour down here this morning.

*Id.* at 11-12. The court then continued the proceedings to allow Mr. Smith and Henley to further confer about the issue. *Id.* at 17.

A second hearing on the conflict was held on March 8, 2012. At the hearing, Mr. Smith informed the court that he had done some additional investigation and stated that his brother became president of the Outcast Motorcycle Club "just before the events of January 2011" and was present at the January 29, 2011 event where Henley and other Wheels of Soul members allegedly conspired to murder Outcast members. (DCD1749 at 5-6). Mr. Smith confirmed that Henley did not know his brother and vice versa. *Id.* at 5. Judge Buckles then asked Smith whether he understood "how there could be the appearance of a potential conflict of interest here?" *Id.* at 6.

After reviewing the caselaw, Judge Buckles inquired into Henley's decision to which Mr. Smith replied, "Mr. Henley and I have gone through this in great detail and given it a considerable amount of deliberation, and he also wishes that I continue to represent him." *Id.* at 10. After conducting an inquiry of Henley himself, the court stated:

4

*That's how bad the appearance of this is*. Okay. And it really raises the question of whether, you think you know all of the consequences of all of this and, you know, you think you know what the problems are. And again we are all – as the Supreme Court said, we can all make guesses in the dark here as to what can come up that can be problems. But you are sitting here telling me, "I don't care. I'm not worried about any of that. I want Mr. Smith to represent me." And I have to decide whether I agree to let you do that.

And the Court and other – as noted in the one quote I read, your right to have a lawyer of your own choosing is a very important right. And the Court – the Court must consider that; that that's your wish, in spite of all these other things; that it's your wish to have him represent you. And that' very important. That's a very important matter in all of these circumstances.

And I have to decide whether this is such a situation where I should honor your wishes or whether I should say, "you know what? This is just so bad that I cannot accept a waiver of the conflict of interest from the defendant." So that's what I'm faced with here this morning.

*And first of all, my personal opinion is I think it's foolish for Mr. Smith to put himself in this position. I can't imagine any lawyer knowing all of these things that would want to continue to represent you in this matter.* I would think it would be too great a burden of having to make that choice between whether I'm going to be worried about, you know, my familial loyalties, my blood loyalties and my loyalties to Mr. Henley and my representation to him. How am I ever going to resolve a conflict? That would always be in the back of my mind. *And frankly, I cannot understand how Mr. Smith can say he doesn't think that's a problem.*

*To me that's foolish. To me it's foolish for you to take that chance in having him continue to represent you, knowing that*

5

> *all of these potential problems are out here and knowing*
> *that's always going to be a question in the case.*

(DCD 1749 at 18-19) (emphasis added). In conclusion, the Magistrate Judge allowed Mr. Smith to continuing representing Henley throughout the proceedings.

Following a twenty-seven day trial and eight days of jury deliberations, Henley was found guilty of Counts I and XIII, but acquitted of the other charged offenses. (DCD 1230). As a result, the district court sentenced Henley to an aggregate 204-month term of imprisonment. (DCD 1515).

Henley filed a timely appeal. This Court rejected all of Henley's appellate claims and affirmed his conviction. *United States v. Henley*, 766 F.3d 893 (8th Cir. 2014). On May 4, 2015, the United States Supreme Court denied Henley's petition for writ of *certiorari*. *Henley v. United States*, 135 S.Ct. 2065 (2015).

On May 3, 2016, Henley filed a Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255. (CvDCD 1).[2] Henley's §

---

[2] All district court docket entries from the underlying civil case ("CvDCD") in this matter are from *Henley v. United States*, 4:16-cv-626-CDP (E.D. Mo.).

6

2255 motion alleged that trial counsel was ineffective for failing to properly and adequately advise Henley regarding a conflict of interest present in the case, and that Henley did not knowingly waive an actual conflict of interest. (CvDCD 1-1 at 4). On June 10, 2016, Henley filed a Supplemental Memorandum of Law to further clarify the facts of this case. (CvDCD 11).

On August 8, 2016, the Government filed its Response to Henley's § 2255 motion. (CvDCD 16). The Government argued that Henley's waiver of any conflict was knowing and voluntary, that counsel was constitutionally effective, and that there was no actual conflict of interest. *Id*. Henley submitted his Reply on September 1, 2016. (CvDCD 19).

On April 18, 2018, the district court issued its Memorandum and Order denying Henley's 28 U.S.C. § 2255 motion. (CvDCD 20). The court concluded that no evidentiary hearing was required, Henley did not receive ineffective assistance of counsel, and that there was no actual conflict of interest. *Id*. Further, the district court declined to issue a certificate of appealability. (CvDCD 20 at 25).

Henley timely filed a notice of appeal to this Court on June 15, 2018. (CvDCD 23). Federal Rule of Appellate Procedure 22 prevents Henley from appealing the denial of his motion under 28 U.S.C. § 2255 "unless a circuit justice of district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22. Accordingly, this Court has jurisdiction under 28 U.S.C. § 2253.

## II. STANDARD OF REVIEW

For a certificate of appealability ("COA") to issue, Henley must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253. This is done through a showing that jurists of reason could disagree with the district court's resolution of his constitutional claim. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The Supreme Court has explained that the COA inquiry is a threshold determination, and full consideration of the merits underlying a claim is inappropriate. *Miller-El*, 537 U.S. at 336 ("This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claim. In fact the statute forbids it.").

In *Buck v. Davis*, 137 S.Ct. 759 (2017), the Chief Justice, writing for the Court, held that the certificate of appealability "inquiry, we have

8

emphasized, is not coextensive with a merits analysis." *Id*. at 773. As the Chief Justice explained:

> That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable. Thus, when a reviewing court [...] inverts the statutory order of operations and 'first decid[es] the merits of an appeal, . . . then justif[ies] its denial of a COA based on its adjudication of the actual merits,' it has placed too heavy a burden on the prisoner at the COA stage. *Miller-El v. Cockrell*, 537 U.S. [322], 336-337 (2003). *Miller-El* flatly prohibits such a departure from the procedure described by §2253.
>
> The statute sets forth a two-step process: an initial determination *whether a claim is reasonably debatable,* and then–if it is–an appeal in the normal course. We do not mean to specify what procedures may be appropriate in every case. But whatever procedures are employed at the COA stage should be consonant with the *limited nature of this inquiry*.

*Id*. at 774 (alterations and emphasis added).

Appellate Case: 18-2319    Page: 10    Date Filed: 07/17/2018 Entry ID: 4682995

# III. ARGUMENT

Henley respectfully submits that a certificate of appealability should issue on the following:

1. **Reasonable Jurists Could Debate The District Court's Conclusion That Henley Did Not Receive Ineffective Assistance of Counsel**

"The Sixth Amendment right to counsel has been interpreted to provide for representation that is 'free from conflicts of interest or divided loyalties.'" *Caban v. United States*, 281 F.3d 778, 781 (8th Cir. 2002) (citation omitted). The Supreme Court has held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to show relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). And, "[a]n actual conflict of interest occurs 'when, during the course of representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Edelmann*, 458 F.3d 791, 807 (8th Cir. 2006) (citation omitted).

A defendant's claim that an attorney was ineffective because he or she acted under a conflict of interest is judged under several different standards depending on the circumstances of the representation. The

10

general rule of *Strickland v. Washington*, 466 U.S. 668 (1984) does not apply to all situations where an attorney acts under a conflict of interest. *Williams v. Ludwick*, 761 F.3d 841, 845 (8th Cir. 2014) (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)). According to the Supreme Court, counsel is ineffective where "the defendant's attorney actively represented conflicting interests." *Mickens*, 535 U.S. at 166. Prejudice is presumed and reversal is automatic where a trial court forces defense counsel "to represent codefendants over his timely objection" without determining that no conflict of interest exists. *Id.* at 167-68 (citing *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978)).

If an objection is raised regarding joint representation at the trial level, the defendant need only prove an actual conflict of interest and reversal follows automatically upon such showing. *Id.* If a defendant does not object to counsel representing a co-defendant, he or she "must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Id.* at 168 (citation omitted). A defendant who makes such a showing "need not demonstrate prejudice in order to obtain relief." *Cuyler,* 466 U.S. at 349-50 (citation omitted).

11

These standards, however, do not apply to all conflicts of interest. *Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010) (noting that the Supreme Court has not extended the *Cuyler* standard that presumes prejudice to conflicts other than those arising from situations in which an attorney represents more than one defendant) (citing *Mickens*, 535 U.S. at 174-75). Without squarely deciding the issue, this Court has held that *Strickland* is the appropriate standard for alleged conflicts involving ethical issues other than multiple or serial representation. *Morelos v. United States*, 709 F.3d 1246, 1252 (8th Cir. 2013) ("[W]e have expressly refrained from deciding whether the lowered burden in establishing prejudice applies to actual conflicts of interest which did not arise out of multiple representation."); *Caban v. United States*, 281 F.3d 778, 783 (8th Cir. 2002) ("We believe there is much to be said in favor of holding that *Cuyler's* rationale favoring the 'almost *per se* rule of prejudice' does not apply outside the context of a conflict between codefendants or serial defendants.'"); *see also Mickens*, 535 U.S. at 168 (noting that "the language of [*Cuyler v.*] *Sullivan* itself does not clearly establish, or indeed even support, such [an] expansive application" of the automatic reversal standard to other types of ethical conflicts).

12

In *Noe*, citing the same Supreme Court authority, this Court summarized these above standards:

> A defendant's claim that he was denied effective assistance of counsel because his attorney labored under a conflict of interest is considered under several different standards. To establish ineffective assistance of counsel, a defendant typically has to demonstrate that his counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 693 (1984). A defendant who timely raises a claim of conflict of interest arising from joint representation is entitled to automatic reversal in the absence of a finding that no conflict existed. *Mickens v. Taylor*, 535 U.S. 162, 168 (2002). If the defendant did not raise the conflict of interest at trial, the defendant must show an actual conflict of interest that affected the adequacy of his representation. *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980); *see also Ausler v. United States*, 545 F.3d 1101, 1104 (8th Cir. 2008).

*Noe*, 601 F.3d at 789. Similarly,

> However, the Supreme Court has limited the automatic reversal rule of *Holloway* to cases "where defense counsel is forced to represent codefendants over his timely objection unless the trial court has determined that there is no conflict." *Mickens v. Taylor*, 535 U.S. 162, 168 (2002). *By contrast, in cases involving a failure to inquire into other types of potential conflicts, Mickens requires that the defendant show that "a conflict of interest actually affected the adequacy of [counsel's] performance," rather than Strickland prejudice.*

*Ausler v. United States*, 545 F.3d 1011, 1104 (8th Cir. 2008) (emphasis added, citations omitted). And,

13

Applying the controlling authority of *Mickens*, Ausler's conflict argument fails for many reasons. First, because the conflict did not involve Jesse's representation of multiple defendants, *Holloway's* automatic reversal rule as construed in *Mickens* does not apply. When attorney Jesse timely raised a possible conflict of interest that did *not* involve representation of multiple defendants, the district court had a duty to determine whether Jesse's representation was compromised by an actual conflict of interest. But when the court concluded otherwise, *to obtain post-conviction relief Ausler must at least show (i) that a conflict of interest existed, and (ii) that the conflict adversely affected Jesse's subsequent performance.*

*Id*. (citations omitted) (emphasis added).

Of the cases cited above, the circumstances most similar to the present is that of *Ausler*. The Magistrate Judge, as evidenced from his adamant discouragement of continued representation by attorney Smith, seemingly and implicitly determined that an actual conflict existed. Notwithstanding such findings, Magistrate Judge Buckles allowed Smith to continue to represent Henley. This Court has held that if the court determines that there is a severe conflict "such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation–the court is obligated to disqualify the attorney." *United States v. Edelmann*, 458 F.3d 791, 807 (8th Cir. 2006).

14

Nonetheless, the district court's Memorandum and Order denying Henley's § 2255 motion concluded that "Henley has presented no evidence of an actual conflict of interest in this case, and it is his burden to do so." (CvDCD 20 at 20). Henley respectfully submits that reasonable jurists could disagree with the district court's conclusion that no actual conflict of interest existed.

The Seventh Circuit has explained the difference between showing "prejudice" in this context and showing an "adverse effect":

> An actual conflict of interest results if "the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." And, "an 'adverse effect' occurs when an attorney's actual conflict of interest causes a 'lapse in representation contrary to the defendant's interests . . . .'"

> Not surprisingly, when raising the issue of an attorney's conflict of interest most defendants . . . proceed under *Cuyler* because it is significantly easier to demonstrate an "adverse effect" than to show "prejudice." Prejudice results under *Strickland* only if there is a reasonable probability that, but for counsel's potential conflict of interest, the defendant would have been found not guilty. *Strickland*, 466 U.S. at 694. An adverse effect occurs, if, but for the attorney's actual conflict of interest, there is "a [reasonable] likelihood that counsel's performance somehow would have been different."

*Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994) (citations omitted).

Appellate Case: 18-2319    Page: 16    Date Filed: 07/17/2018 Entry ID: 4682995

In his § 2255 motion, Henley argued that prejudice or an "adverse effect" must be presumed for several reasons. First, it is obvious from the magistrate's own words at the motion hearings that an actual conflict existed, notwithstanding the fact that he allowed attorney Smith to continue representing Henley. Secondly, Henley's decision to continue with Smith's representation could not have been a knowing and intelligent decision. As stated above, Henley's decision in that respect was based upon advice from the very attorney who was the subject of the conflicted loyalties. The Supreme Court has opined that *Strickland* is not necessarily the proper standard for analyzing all ineffective assistance claims:

> It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, *there are situations in which the overriding focus on fundamental fairness may affect the analysis*. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed. 466 U.S., at 682. *And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice."*

*Williams v. Taylor*, 529 U.S. 362, 391-92 (2000) (emphasis added). And in *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court

> recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must

16

demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."* 466 U.S., at 658.

*Florida v. Nixon*, 543 U.S. 175, 190 (2004) (emphasis added). Further, the First Circuit has noted that "*Cronic-like principles have been applied, for example, in situations in which defense counsel labored under an actual conflict of interest." Scarpa v. Dubois*, 38 F.3d 1, 12 (1st Cir. 1994) (citation omitted, emphasis added).

As the district court concluded that Henley "knowingly and voluntarily waived his right to conflict-free counsel[.]" (CvDCD 20 at 23). However, the district court did not fully address Henley's argument that his waiver was not knowing and voluntary given he was advised by the same conflicted counsel. As this Circuit has held, a defendant waiving conflict of interest, "'must be aware of the conflict, realize the consequences to his defense that continuing with counsel under the onus of a conflict could have, and also be aware that he has the right to obtain other counsel.'" *Edelmann*, 458 F.3d at 807-08 (citation omitted). Henely conceded to being aware of the right to proceed with different counsel, however, Henley did alleged that he did not "realize the

17

consequences to his defense that continuing with counsel under the onus of conflict could have." (CvDCD 11 at 13). As such, Henley argued that had he been fully apprised by an independent attorney relative to the conflict of interest, there was at least a reasonable probability that Henley would not have waived his constitutional right to conflict-free representation. *Id.* at 14.

One of the only two counts Henley was convicted of was Count XIII, the Conspiracy to Commit Murder of an Outcast club member at the January 29, 2011 party. A party where attorney Smith's brother was in attendance as president of the Outcast club and an obvious target. Ironically, although the Government called approximately sixty witnesses at trial, Henley's attorney called only one witness–Henley himself. This inarguably draws into question counsel's trial strategy.

Finally, the district court's denial of Henley's § 2255 motion failed to address Henley's claim that the conflict of interest counsel labored under persisted, and worsened, on appeal. Henley alleged that Smith's brother also worked in Smith's law firm during Henley's direct appeal. (CvDCD 11 at 11). Henley would again submit that the same brother who was the potential target of Count XIII working in Mr. Smith's law

18

firm at the time Mr. Smith was representing Henley on direct appeal is

inarguably an actual conflict of interest.

## 2. Reasonable Jurists Could Debate The District Court's Denial Of Henley's § 2255 Motion Without Holding An Evidentiary Hearing

In denying Henley § 2255 relief, the district court concluded:

> The records before me conclusively demonstrate that Henley has no right to relief. I will not hold an evidentiary hearing on this matter. "A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and records of the case conclusively show that he is entitled to no relief." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (internal quotation marks omitted). "No hearing is required, however, where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Id*. (internal quotation marks and citations omitted). The record here conclusively refutes the claims, so I will not hold an evidentiary hearing.

(CvDCD 20 at 16).

Henley submits that jurists of reason could debate the district

court's denial of his § 2255 motion without holding an evidentiary

hearing. While many of the facts are not in dispute, there still remains

questions about facts that exist outside the record that are prudent to

Henley's § 2255 claims. One such example is Henley's allegation that

Mr. Smith's brother worked in Mr. Smith's office at the time of Henley's

19

direct appeal. This issue was not addressed in Mr. Smith's affidavit that was submitted in conjunction with the Government's Response to Henley's § 2255 motion. (CvDCD 16-2). In fact, it this argument was entirely ignored by Mr. Smith and the district court's order denying § 2255 relief. Henley has alleged claims that, if true, would entitle him to § 2255 relief. As such, reasonable jurists could debate that the district court erred in denying Henley's § 2255 motion without holding an evidentiary hearing.

## IV. CONCLUSION

Based on the foregoing, the Court should grant Henley a certificate of appealability.

Respectfully submitted,

/s/ Jeremy Gordon
Jeremy Gordon
Jeremy Gordon, PLLC
1848 Lone Star Road, Suite 106
Mansfield, Texas 76063
Tel: 972-483-4865
Fax: 972-584-9230
Email: Jeremy@gordondefense.com
Texas Bar No. 24049810

*Attorney for Dominic Henley*

20

## CERTIFICATE OF PERFORMANCE OF VIRUS CHECK

I, Jeremy Gordon, hereby certify that on July 13, 2018, I caused a virus check to be performed on the electronically filed copy of this Application for Certificate of Appealability using the following software: Avast Mac Security, Version 13.8. No virus was detected.

July 17, 2018.

/s/ Jeremy Gordon

## CERTIFICATE OF COMPLIANCE

I, Jeremy Gordon, hereby certify that:

1.      This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because the motion contains 4,649 words.

2.      This motion complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Century Schoolbook font.

/s/ Jeremy Gordon

21

## CERTIFICATE OF SERVICE

I, Jeremy Gordon, certify that a true and correct copy of this Application for Certificate of Appealability was duly served on all counsel of record via the Court's CM/ECF system this 17th day of July 2018.

/s/ Jeremy Gordon

Appellate Case: 18-2319    Page: 23    Date Filed: 07/17/2018 Entry ID: 4682995